ORDERED in the Southern District of Florida on

SEP 29 2008



A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

TIREX INTERNATIONAL, INC.,

      Debtor.

_____/

CASE NO.:  08-14264-BKC-AJC
Chapter 7

JOEL L. TABAS, in his capacity as
TRUSTEE OF THE BANKRUPTCY ESTATE OF
TIREX INTERNATIONAL, INC.,

      Plaintiff,

vs.

FORDBERRY PLC,
f/k/a FORDBERRY (UK) LTD.,

      Defendant.

_____/

ADVERSARY NO.: 08-01395-AJC

**MEMORANDUM ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION AND GRANTING MOTION TO COMPEL
ARBITRATION**

MIAM_60234.1

Plaintiff, Joel Tabas ("the Trustee"), in his capacity as Chapter 7 Trustee in Bankruptcy for Debtor, Tirex International, Inc. ("Tirex"), initiated an adversary proceeding against Defendant, Fordberry Plc, f/k/a Fordberry (UK) Ltd. ("Fordberry"), a public limited company registered in the United Kingdom with its principal place of business in South Wales, UK, to recover a deposit in excess of $1 million for certain off-road tires that were never delivered to Tirex as promised.  Fordberry has moved to dismiss for lack of *in personam* jurisdiction or, alternatively, to compel arbitration of the claims asserted against it and to abate the instant adversary proceeding.

## I.    FACTUAL BACKGROUND

The parties have submitted declarations in support of their respective positions.  The factual circumstances surrounding the subject transaction are as follows:

1.    The Debtor, Tirex, is a Florida corporation with its principal place of business located in Coral Gables, Florida.  Tirex is engaged in the business of, among other things, buying and selling commercial tires including, but not limited to, certain specialized tires for off-road vehicles ("OTR Tires").  OTR Tires are used with heavy equipment operating primarily off of paved roadways, such as construction machinery, bulldozers, cranes, and over-sized trucks.

2.    On or about June 16, 2006, Fordberry sent an e-mail to Tirex offering OTR tires and truck tires for sale, asking, "[a]re you looking for tyres."  The e-mail was of the type of unsolicited "spam," "bulk," or "junk" e-mail that involves an identical message to numerous recipients.  The e-mail solicitation contained a PDF attachment offering for sale specific sizes of OTR and other tires and provided Fordberry's e-mail address, telephone and facsimile numbers for potential customer inquiries.

MIAM_60234.1

3.      Soon thereafter, Tirex was contacted by another dealer of OTR tires, Advantage Tire, Inc., which indicated that it had a customer who was looking to purchase 24 new Michelin size 40.00R57 OTR Tires ("the Michelin OTR Tires") and was willing to work through Tirex. Advantage Tire is located in Moses Lake, Washington.

4.      Based on Fordberry's initial e-mail offering, Tirex contacted Fordberry in or about late July 2006, to purchase the Michelin OTR Tires requested by Advantage Tire.

5.      On or about August 21, 2006, Fordberry delivered by e-mail to Tirex, at its offices in Coral Gables, Florida, a "Pro Forma Invoice" providing for the sale of the Michelin OTR Tires at a cost of $ 99,000.00 each, for a total purchase price of $2,376,000.00.

6.      The proposal called for transmission of a 50% advance deposit (the "Deposit"), and identified the month of October 2006 as the "[e]xpected date of shipment." In two separate installments, Tirex wire-transferred the Deposit contemplated by the "Pro-Forma Invoice."

7.      The "General Conditions of [A]cceptance" included the following:

> All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules.

8.      A Tirex representative signed the Pro Forma Invoice and returned it to Fordberry.

9.      It is undisputed that Fordberry failed to ship the Michelin OTR Tires by the end of October 2006 as agreed. Despite repeated assurances that it could perform, by February 2007, both Tirex and Fordberry recognized that Fordberry could not deliver the tires.

10.      Thereafter, Tirex demanded return of the Deposit and the parties entered into a new round of negotiations in an effort to agree, not on delivery of the tires or any other substitute performance, but on a resolution of Tirex's demand for refund of the Deposit.

3

11.     On or about October 18, 2007, Fordberry forwarded to Tirex by e-mail attachment a "Reimbursement Agreement and Promissory Note," pursuant to which Fordberry was to refund to Tirex the Deposit in monthly installment payments of $50,000.00 beginning on November 22, 2007, and continuing until the Deposit was returned in full.  The agreement was signed by Tirex, but not by Fordberry.

12.     Tirex claims that Fordberry reneged on this agreement, while Fordberry denies that an ultimate agreement was reached between the parties.  No separate arbitration clause is included in the Reimbursement Agreement and Promissory Note.

13.     Since its initial e-mail solicitation on or about June 16, 2006, Fordberry has sent similar e-mail offerings to Tirex at its offices in Coral Gables, Florida.

14.     To date, Fordberry has never returned any of the monies from the Deposit it received for the Michelin OTR Tires it failed to deliver.

15.     On or about February 14, 2008, Tire Distribution Systems, Inc., the ultimate source of the funds for the Deposit, sued Tirex to recover that money by filing suit in the United States District Court for the Southern District of Florida.  On or about April 16, 2008, Tirex filed a Chapter 7 petition for bankruptcy.

16.     On June 16, 2008, the Trustee, on behalf of the bankruptcy estate of Tirex, filed the instant adversary proceeding against Fordberry seeking to recover the Deposit and alleging claims for breach of contract (Count I), breach of the Reimbursement Agreement and Promissory Note (Count II), and unjust enrichment (Count III).

17.     Plaintiff opposes Defendant's motion to dismiss and motion to compel arbitration, claiming that:

4

A.      Defendant's specific and general contacts with Florida and the United States are sufficient for the Court to exercise jurisdiction over the Defendant in this proceeding; and

B.      Plaintiff's Count I claim for breach of the contract evidenced by the purchase order signed by the Debtor is not covered by the arbitration agreement because that agreement was terminated by the Debtor for Defendant's non-performance, that Plaintiff's Count II claim for breach of an alleged subsequent settlement agreement between the parties is not covered by the contract evidenced by the purchase order signed by the Debtor, and that Plaintiff's Count III claim for quantum meruit is also not covered by the contract evidenced by the purchase order signed by the Debtor.

## II.    ANALYSIS

## A.    Motion to Dismiss for Lack of Personal Jurisdiction

### 1.    Minimum contacts

Typically, the Court's initial inquiry into personal jurisdiction would address whether there is a basis for jurisdiction under the forum state's long-arm statute. In an adversary proceeding pending before a bankruptcy court, Federal Bankruptcy Rule 7004(f) authorizes personal jurisdiction over defendants to the extent allowed under the Due Process Clause of the Fifth Amendment. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir. 1997); *In re Banco Latino Int'l,* 176 B.R. 278, 281 (Bankr. S.D. Fla. 1994); *see also In re Teknek, L.L.C.,* 354 B.R. 181, 191 (Bankr. N.D. Ill. 2006).[1]

---

[1] Even if Florida's long-arm statute were to apply, this Court would have jurisdiction over Fordberry. Fla. Stat. § 48.193(1)(g) provides for jurisdiction over a defendant who is guilty of "[b]reaching a contract in this state by failing to perform acts required . . . in this state."

5

The familiar and long-established principles of *International Shoe v. State of Washington,* 326 U.S. 310 (1945), and its progeny guide the determination of whether jurisdiction over a defendant comports with due process. The basic inquiry is whether the defendant has established sufficient minimum contacts or some presence in the forum so that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985). A defendant's contacts with the forum must be such that it would reasonably anticipate being haled into court there. *See World-Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Among other things, the "minimum contacts" doctrine examines whether the defendant's contacts with the forum are attributable to its own actions or are solely the actions of the plaintiff. *See Asahi Metal Industries v. Superior Court of Solano County,* 480 U.S. 102, 109 (1987).

A bankruptcy court may look beyond a non-resident defendant's "minimum contacts" with a particular forum state to the defendant's aggregate contacts with the United States as a whole. *See In re Teknek,* 354 B.R. at 192; *In re North,* 279 B.R. 845, 851 (Bankr. D. Ariz. 2002). A single purposeful contact directed toward the forum has been held sufficient to meet the "minimum contacts" standard necessary to exercise personal jurisdiction. *See Cable/Home Communications Corp. v. Network Productions, Inc.,* 902 F.2d 829, 858 (11th Cir. 1988) (citing *Rudzewicz,* 471 U.S. at 475); *Williams Elec. Co., Inc. v. Honeywell, Inc.,* 854 F.2d 389, 392-93 (11th Cir. 1988); *In re Banco Latino,* 176 B.R. at 283; *see also In re Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C.,* 87 F.3d 413, 419 (10th Cir. 1996) (citation omitted).

In the instant case, the jurisdictional issue is one of "specific," not "general" jurisdiction. A court may exercise "specific" jurisdiction over a non-resident defendant if that defendant has

6

purposefully directed its activities at forum residents and the underlying litigation arises from, or is directly related to, the defendant's contacts with the forum. *See Cable/Home,* 902 F.2d at 857. In cases involving specific personal jurisdiction, the Eleventh Circuit uses three criteria to determine whether the "minimum contacts" test is satisfied: (1) the defendant's contacts must be related to the plaintiff's cause of action or have given rise to it; (2) the contacts must involve some purposeful availment of the privilege of conducting activities within the forum; and (3) the defendant's contacts within the forum must be such that it should reasonably anticipate being haled into court there. *See Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 631 (11th Cir. 1996); *Stateline Power Corp.. v. Kremer,* 404 F. Supp. 2d 1373, 1378-79 (S.D. Fla. 2005); *Design-Build Concepts, Inc. v. Jenkins Brick Co.,* 2008 WL 686150 (N.D. Fla. Mar. 10, 2008). Based upon the facts before this Court, all three of the aforementioned criteria are easily met and Fordberry has sufficient minimum contacts with this forum within the meaning of *International Shoe* and its progeny.

First, Fordberry's contacts with the instant forum gave rise to each of the Trustee's claims. Each count of the Adversary Complaint involves the return of the Deposit to Tirex at its offices in Coral Gables, Florida, and each cause of action arises out of or directly relates to Fordberry's various contacts with Tirex in this forum to solicit the sale of OTR tires, and to negotiate and to enter into the Pro Forma Invoice and the Reimbursement Agreement and Promissory Note.

Second, Fordberry purposefully availed itself of this forum. On or about June 16, 2006, Fordberry initiated contact between the parties by sending an e-mail to Tirex at its offices in Coral Gables, Florida, offering to sell or source OTR tires and truck tires. The e-mail solicitation also contained an attachment that offered for sale specific sizes of OTR and truck tires, as well as

Fordberry's e-mail address, telephone and facsimile numbers. That e-mail solicitation was a deliberate and unilateral action taken by Fordberry, which brought it into contact with Florida and the United States. In response to Fordberry's offering, Tirex reached out to Fordberry by e-mail to inquire about purchasing the Michelin OTR Tires.

Moreover, after its initial e-mail offering, Fordberry directed several e-mails to Tirex to negotiate the terms of the tire sale agreement, and sent its "Pro Forma Invoice" to Tirex at its offices in Coral Gales, Florida. Thereafter, when Fordberry failed to deliver the Michelin OTR Tires as contractually agreed, numerous e-mails were exchanged regarding the status of the shipment. When it became clear that Fordberry would not fulfill the tire sale agreement, the contract was considered terminated and the parties began negotiations to return the Deposit. At this time, e-mails were exchanged between Fordberry and Tirex at its offices in Coral Gables, Florida, as well as between Fordberry and Advantage Tire located in Moses Lake, Washington. And, on or about October 18, 2007, Fordberry sent to Tirex by e-mail attachment a "Reimbursement Agreement and Promissory Note," whereby Fordberry purportedly promised to re-pay the Deposit in monthly installments in exchange for Tirex's agreement to forebear prosecuting its claims against Fordberry. Fordberry's various contacts with the forum gave rise to each of the Trustee's claims for breach of contract, unjust enrichment, and breach of the Settlement Agreement.

Furthermore, since its initial e-mail offering on June 16, 2006, Fordberry has sent to Tirex hundreds of additional "bulk" or "spam" e-mail solicitations offering to buy and sell OTR tires. The nature of these "bulk" or "spam" e-mail offerings sent to Tirex strongly suggests that they were also sent to other buyers and re-sellers of OTR tires located in the United States.

Fordberry concedes that it completed at least one other sale in the United States, to a customer in North Carolina.

Courts throughout the nation have held that similar electronic contacts are enough to establish personal jurisdiction. "E-mails, like letters and phone calls, can constitute minimum contacts, at least if the defendant or his agents send the message for pecuniary gain . . . ." *Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assur. Corp.,* 160 F. Supp.2d 1327, 1333 (M.D. Ala. 2001). *See also Aitken v. Communications Workers of Am.,* 496 F. Supp.2d 653, 660 (E.D. Va. 2007) (defendants purposefully availed themselves of Virginia forum by sending e-mails to employees of Virginia corporation over servers located in Virginia); *Verizon Online Services, Inc. v. Ralsky,* 203 F. Supp.2d 601, 616-19 (defendant purposefully availed himself of forum where e-mails were commercial in nature); *Internet Doorway, Inc. v. Parks,* 138 F. Supp. 2d 773, 776-79 (e-mail to plaintiff in attempt to solicit business was a purposeful act sufficient to invoke personal jurisdiction).[2]

---

[2] A model has been developed to determine when an out-of-state defendant enters a forum state via its electronic contacts base on the case of *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F. Supp. 1119, 1124 (W.D. Pa. 1997):

> [A] state may, consistent with due process, exercise jurisdictional power over a person outside of the State when that person (1) directs electronic activity into the State; (2) with the manifested intent of engaging in business or other interactions within the State; and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan, Inc. v. Digital Service Consultants, Inc.,* 293 F.3d 707, 714 (4th Cir. 2002). In *Zippo,* the court recognized a "sliding scale" for defining when electronic contacts with a state are sufficient:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

952 F. Supp. at 1124. Fordberry's contacts with the forum clearly fall into the "active" portion of the scale.

The fact that Fordberry does not have a physical presence in Florida or the United States does not insulate it from jurisdiction with respect to the subject transaction that it initiated and pursued here.  In a global economy connected by telephone, facsimile, and e-mail, this Court and others have recognized the prevalence of electronic and wire communications and have adjusted the standard of personal jurisdiction accordingly.  *See In re Banco Latino,* 176 B.R. at 283 (citations omitted) ( "[n]umerous courts have given meaningful bearing to telephone and mail contacts directed to the forum").  *See also Rudzewicz,* 471 U.S. at 476 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"); *Cable/Home,* 902 F.2d at 858 ("[i]n our technologically sophisticated world permitting interstate business transactions by mail, wire and satellite signals, physical presence by the nonresident defendant is not necessary for personal jurisdiction in the forum state"); *Continental American Corp. v. Camera Controls Corp.,* 692 F.2d 1309, 1314 (10th Cir. 1982) ("[w]e recognize that modern commercial transactions often involve little contact with the forum beyond that of mail and telephone communications . . . . ").

In sum, the parties' prolonged relationship, initiated by Fordberry, consisting of dozens of e-mails and other telecommunications, and resulting in one, if not two separate agreements involving several million dollars is sufficient to establish minimum contacts with this forum. *See e.g., In re Banco Latino,* 176 B.R. at 283 ("telephone, telefax, and mail contacts" that the defendant directed to plaintiff in the forum "militate[s] in favor of jurisdiction"); *Thompson v. King,* 523 F. Supp. 180, 185 (M.D. Fla. 1981) (exercise of personal jurisdiction satisfied due process where defendant's "sole contact" with Florida was his alleged promise to make payment

in the state); *Moltz v. Seneca Balance, Inc.,* 606 F. Supp. 612, 616 (S.D. Fla. 1985) (failure to make payment due under a note in Florida constituted sufficient "minimum contacts").

Finally, in light of these contacts, Fordberry cannot credibly claim surprise at being called upon to answer in a court of the United States for economic injury inflicted on a United States company. Fordberry "purposefully availed" itself of the privilege of conducting activities within Florida for the purpose of making money from a Florida corporate citizen, thus invoking the benefits and protections of Florida law. Fordberry should reasonably have anticipated being haled into a Florida courts if it ended up with more than $1 million that did not belong to it as a result of a transaction that it started by soliciting Florida buyers. Indeed, Fordberry should have recognized that its failure to return the Deposit to Tirex made it inevitable that Fordberry would be haled into court in this forum. *See* 176 B.R. at 283 (finding that Bahamian bank's failure to pay debt to Miami bank upon maturity "redoubles [the defendant's] expectation of being haled into Court there").

### 2.    *Traditional Notions of Fair Play and Substantial Justice*

Once minimum contacts have been established, the Court must turn to the issue of whether maintenance of this suit would comport with "'traditional notions of fair play and substantial justice.'" *See Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 113 (1987); *see also In re Banco Latino,* 176 B.R. at 284. "Once minimum contacts are established, however, a presumption exists that jurisdiction is reasonable, and the burden is placed squarely on the defendant to present a 'compelling case' that jurisdiction would be unreasonable." *In re Banco Latino,* 176 B.R. at 284 (citing *Rudzewicz,* 471 U.S. at 478).

In its Motion to Dismiss, Fordberry makes no proffer whatsoever, either factual or legal, to suggest that any substantial burden will be placed on it in defending a suit in the United States.

11

Even if it had, however, this Court has recognized that in this age of jet travel and global communications, such arguments lack merit. "Modern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." *In re Chase & Sanborn Corp.,* 835 F.2d 1341, 1346 (11th Cir. 1988), *reversed on other grounds,* 492 U.S. 33 (1989) (there were "few impediments" for a Columbian company to defend itself in bankruptcy court in Miami, Florida, and noting that transportation between Bogota and Miami is "readily available"). *See also Morris v. SSE, Inc.,* 843 F.2d 489, 495 (11th Cir. 1988) ("modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity"); *Banco Latino,* 176 B.R. at 284 ("[t]ransportation between the Caribbean, South America, and Miami is readily available"). Indeed, if Fordberry wished to reach out and solicit business from Tirex in Florida, then it must also accept the burdens of litigating its disputes in this forum.

While there are unique burdens placed on a defendant foreign to the United States when litigating in this country's legal system, the Supreme Court has held that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *See Asahi Metal,* 480 U.S. at 114. In this case, Tirex is a debtor in Chapter 7 liquidation and its filings evidence a total unsecured debt in excess of $1.5 million. The interests of the Trustee in recouping the monies owed to Tirex by Fordberry for the benefit of the estate justify compelling the Defendant to litigate this adversary proceeding in the United States Bankruptcy Court. *See Chase,* 835 F.2d at 1346-47; *Banco Latino,* 176 B.R. at 284.

Fordberry has <u>not</u> demonstrated any substantial reason for defeating jurisdiction in this forum. "[W]here a defendant who purposefully has directed his activities at forum residents

12

seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Rudzewicz,* 471 U.S. at 477. Fordberry has not, and cannot, make that showing in this case. Accordingly, Fordberry's Motion to Dismiss for Lack of Personal Jurisdiction is denied.

**B.    Motion to Compel Arbitration**

In support of its motion to compel arbitration, Fordberry relies upon the arbitration clause found in the Pro Forma Invoice and the principle that arbitration clauses in the international context are strongly favored. In response, the Trustee argues that the Pro Forma Invoice was terminated and that each of the causes of action alleged herein arose *after* termination and/or do not arise out of or relate to the Pro Forma Invoice.

There is a strong federal policy in favor of arbitration, *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1985), and the Arbitration Act calls for the enforcement of valid arbitration agreements, *see* 9 U.S.C. § 2. This "federal policy applies with special force in the field of international commerce," *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), because the United States has acceded to the Convention on Recognition and Enforcement of Foreign Arbitral Awards (the Convention), December 29, 1970, 21 U.S.T. 2517. (The Convention is implemented in this country through the Arbitration Act, 9 U.S.C. § 201 et seq.) "In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding." *See Whiting-Turner Contracting Co. v. Electric Machinery Enterprises, Inc.*, 479 F.3d 791, 796, 798 (11th Cir. 2007).

Section 4 of the Federal Arbitration Act (the "FAA") provides, in relevant part:

A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district

13

court ... for an order directing that such arbitration proceed in the manner provided for in such agreement ... [T]he court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

*See* 9 U.S.C. §4.

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *See Moses H. Cone Memo. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24 (1983). By enacting the FAA, Congress sought to guarantee that arbitration agreements are enforced, as written, and to prevent parties from avoiding their contractual obligations to arbitrate. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). Thus, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" *Moses H. Cone*, 460 U.S. at 24-25.

Additionally, the FAA provides that a written arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. §2. This language in the FAA reflects "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone*, 460 U.S. at 24. In fact, Congress considers this policy to be so important that a district court's interlocutory grant of such a motion is not immediately appealable. See 9 U.S.C. §§ 16(a)(1)(B), 16(b)(2); *Thomson McKinnon Sec., Inc. v. Salter*, 873 F.2d 1397, 1399 (11th Cir. 1989); *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1274 (6th Cir. 1990). This limitation on appeals reflects Congress's studied determination "to promote arbitration and to keep judicial involvement to the barest minimum." *O.P.C. Farms, Inc. v. Conopco Inc.*, 154 F.3d 1047, 1049 (9th Cir. 1998).

Finally, arbitrability turns on the underlying facts of Plaintiff's claims, not on the legal labels the plaintiff attaches to them. *See Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382, 384 (11th Cir. 1996). If the allegations underlying a Plaintiff's claims "touch matters" covered by an agreement containing an arbitration clause, then those claims must be arbitrated, regardless of how they are labeled. *See Mitsubishi*, 473 U.S. at 624-25 n.13.

The leading Eleventh Circuit case on the enforceability of arbitration clauses in the bankruptcy context is *Whiting-Turner*, 479 F.3d at 791. In that case, Whiting-Turner, as a general contractor for a construction project, hired the debtor, Electric Machinery, to provide electrical work. *Whiting-Turner,* 479 F.3d. at 794. The project ran into some delays and associated cost overruns. *Id*. Electric Machinery and Whiting-Turner entered into an agreement, which among other things, provided that any issues among them would be arbitrated. Id. When Electric Machinery filed for bankruptcy it alleged that it was still owed a substantial sum of money from the contract. *Id.* Whiting-Turner moved to compel arbitration of the dispute before the bankruptcy court. *Id.* at 795.

The Eleventh Circuit applied the following analysis to determine if arbitration must be compelled. First, it examined whether the parties "entered into a valid arbitration agreement to resolve any and all claims or issues between them." *Whiting-Turner*, 479 F.3d. at 795. In the *Whiting-Turner* case, as in this case, this first prong was not disputed. *Id*. If the first prong is met, then the party opposing arbitration has the burden to prove "that Congress intended to preclude a waiver of judicial remedies for [the particular claim] at issue." *Id.* quoting *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

This second prong mandates that Congressional intent be examined according to three factors: "(1) the text of the statute; (2) its legislative history; and (3) whether an inherent conflict

MIAM_60234.1

between arbitration and the underlying purposes [of the statute] exists." *Whiting-Turner*, 479 F.3d. at 796 (citations and internal quotations omitted). The Eleventh Circuit further held that they find "no evidence within the text or in the legislative history that Congress intended to create an exception to the [Federal Arbitration Act] in the Bankruptcy Code." *Id*. Therefore, the only factor which remains applicable, in the bankruptcy context, is whether an inherent conflict between arbitration and the underlying purposes of the Bankruptcy Code exists.

In assessing whether a dispute falls within the scope of an arbitration clause, the court's focus "is on the 'factual allegations in the complaint rather than the legal causes of action asserted.'" *Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F.Supp. 853, 868 (D.N.J.1992) quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 622 n. 9, 105 S.Ct. 3346, 3351 n. 9, 87 L.Ed.2d 444 (1985). "If the allegations of the complaint involve matters covered by the parties' underlying agreement, the claims must be arbitrated, regardless of the legal labels ascribed to the claims." *Zimmerman*, 783 F.Supp. at 868.

The Pro Form Invoice signed by Tirex and sent to Fordberry to confirm its order is a valid agreement supported by adequate consideration in the form of a written promise to pay an agreed sum in exchange for the "tyres" ordered. *See e.g. Brinson v. Herlong*, 121 Fla. 505 (Fla. 1935) (A valuable consideration imports something of value being paid or promised.); *Diaz v. Rood*, 851 So. 2d 843 (Fla. 2nd DCA 2003) (A promise, no matter how slight, can constitute sufficient "consideration" so long as a party agrees to do something that they are not bound to do.)

As quoted above, Plaintiff is obligated to submit to binding arbitration, inter alia, "[a]ll disputes arising out of or in connection with the present contract ...." Arbitration provisions

similar to this one have been recognized as being "extremely broad." *See Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382 (11th Cir. 1996); *Cincinnati Gas & Electric Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 159-60 (7th Cir. 1983); *Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001) (noting the broad scope accorded the phrase "arising out of or related to"). As such, federal courts applying provisions like the instant one have ordered arbitration unless "the person seeking to avoid [arbitration] can show that the particular dispute is expressly excluded." *Id.* This presumption in favor of arbitration is "only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2nd Cir. 1999), *cert. denied*, 531 U.S. 815 (2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24- 25.

Applying these principles to the arbitration provision contained in the contract at issue, Plaintiff's claims against Fordberry fall squarely within the confines of the extremely broad arbitration language in the Pro Forma Invoice. Plaintiff has expressly alleged the existence of an agreement memorialized by the Pro Forma Invoice signed by Tirex, and incorporated allegations about its terms in each of the claims asserted against Fordberry. Thus, from the allegations of the Adversary Complaint itself, Plaintiff's claims plainly arise out of or arise in connection with the Pro Forma Invoice signed by Tirex.

Moreover, even if there were some residual doubt as to whether those claims are within the scope of the parties' contract, such doubt would have to "be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. *See also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is

17

not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."); *Mitsubishi*, 473 U.S. at 626; *Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1014 (11th Cir. 1998) ("any doubts about the scope of arbitrable issues must be resolved in favor of arbitration"); *Georgia Power Co. v. Cimarron Coal Corp.*, 526 F.2d 101, 106 (6th Cir. 1975) quoting *American Radiator Standard Sanitary Corp. v. Local Int'l. Brotherhood of Operative Potters*, 358 F.2d 455, 458 (6th Cir. 1966) ("arbitration should not be denied unless it may be said with positive assurance that the clause does not cover the dispute"). Plaintiff should be held to Tirex's bargain and should be required to submit the claims asserted in the Adversary Complaint to binding arbitration, pursuant to the terms of the contract between Tirex and Fordberry.

There is no inherent conflict between the arbitration and the underlying purposes of the Bankruptcy Code in this case. Plaintiff has not come forward with any argument that the facts and matters at issue herein demonstrate an inherent conflict between arbitration and the underlying purposes of the Bankruptcy Code.

This Court finds that Plaintiff's arguments that its claims somehow fall outside of the scope of the agreement to arbitrate between the Debtor and Defendant are without merit. A provision in the contact which provides that disputes "arising out of" or "in connection with" the contract are to be submitted to arbitration will be generally construed to include any controversy with a significant relationship to the contract, which cannot be resolved without reference to or construction of the contract, or which has its origin or genesis in the contract. *See* cases cited in 21 Williston on Contracts §57:21 (4th Ed) (notes 15, 16 and 17). *See also I.D.E.A. Corp. v. WC & R Interests, Inc.*, 545 F.Supp.2d 600 (W.D. Texas 2008) ("An arbitration provision that expressly encompasses disputed 'related to' or 'connected with' the agreement containing the

18

provision is construed broadly. . . Such a provision . . . embraces[s] all disputes between the parties having a significant relationship to the contract.' . . . A broadly construed arbitration provision may encompass claims arising under a separate agreement. . .."); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir.1999) ("Every court that has construed the phrase "arising in connection with" in an arbitration clause has interpreted that language broadly. We likewise conclude that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.")

The broad arbitration clause at issue does cover Plaintiff's Count I, a claim for breach of contract, and Plaintiff's Count II, a claim for breach of an alleged settlement agreement, both of which have their origin or genesis in the original contract. Indeed, it appears that there would be no consideration for the Count II settlement agreement if it was not for the alleged breach of the original contract between the parties.

Plaintiff's Count III, the unjust enrichment claim, is also subject to arbitration. This Count of Plaintiff's Adversary Complaint specifically incorporates allegations about the original contract between the Debtor and Defendant by reference. Additionally, a number of courts have held that unjust enrichment claims are arbitratable, provided the contract's arbitration clause is broad enough to cover such claims. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 668 (2d Cir.1997) ("Fourth claim seeking damages for unjust enrichment alleges that Gidatex received "unjust" benefits through "repudiation and termination of plaintiffs' agency agreement." . . . This claim is naturally dependent on appellants' rights under the Gidatex Agreement and also touches matters covered by the Gidatex Agreement; thus, the unjust enrichment claim is also subject to mandatory arbitration); *Genesco,* 815 F.2d at 854 ("Because

19

this claim is predicated on the defendants' contractual duty to bill 'Genesco accurately for the specific goods ordered, it too 'arises under' ' the textile sales contracts. [Citation omitted.] Since the sales agreements lie at the heart of both the unjust enrichment and money had and received claims, they must also be resolved through arbitration."). Indeed, *Campaniello* and *Genesco* make clear that the focus of the analysis is on whether the factual allegations underlying the claim touch matters covered by the parties' agreement. *Campaniello*, 117 F.3d at 668; *Genesco*, 815 F.2d at 846. Because Plaintiff's unjust enrichment claim touches on the original contract between the Debtor and the Defendant in this case, Plaintiff's unjust enrichment claim is subject to arbitration as well.

Therefore, this Court finds that all of the claims in Plaintiff's Adversary Complaint are subject to arbitration.

### III.    CONCLUSION

Fordberry has sufficient minimum contacts with the instant forum to support the exercise of specific personal jurisdiction. Maintenance of this suit does not offend traditional notions of fairness and substantial justice, and Fordberry has offered no countervailing argument to show that due process requires otherwise. The Trustee's claims for breach of contract, breach of the Reimbursement Agreement and Promissory Note and unjust enrichment are inextricably intertwined such that they are all governed by the arbitration clause in the Pro Forma Invoice. The facts supporting all the claims arise from the same transaction and fall within the scope of the arbitration clause in the Pro Forma Invoice.

Based on the foregoing, it is

**ORDERED AND ADJUDGED as follows**:

1.    Fordberry's Motion to Dismiss this action for lack of jurisdiction is DENIED.

    2.      Fordberry's Motion To Abate this Action and Compel Arbitration is GRANTED.

The parties are ordered to arbitrate the claims asserted in Plaintiff's complaint in compliance

with the terms of the agreement to arbitrate between the Debtor and Defendant.

###

Copies furnished to:

Stephen J. Kolski, Jr., Attorney for Defendant
2600 Douglas Road, Suite 1109
Coral Gables, FL 33134

Stephen J. Kolski, Jr., Esq., is directed to mail a conformed copy of this Memorandum and Order
to all interested parties immediately upon receipt of same and shall file a certificate of service
with the Clerk of the Court.

MIAM_60234.1